**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2503-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KIM A. CARTER, a/k/a
KIM CARTER, LA-HEEM,
and RA-HEEM,

    Defendant-Appellant.

_____

Argued April 9, 2024 – Decided April 16, 2024

Before Judges Puglisi, Haas and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 19-02-0269.

John V. Saykanic, Designated Counsel, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; John V. Saykanic, on the brief).

Nancy Anne Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Nancy Anne Hulett, of counsel and on the brief).

PER CURIAM

A Middlesex County grand jury charged defendant Kim A. Carter in a ten-count superseding indictment with first-degree murder (count one); second-degree unlawful possession of a weapon (count two); second-degree possession of a weapon for an unlawful purpose (count three); third-degree possession of a controlled dangerous substance (CDS) with intent to distribute (counts four and seven); third-degree possession of a CDS with intent to distribute (counts five and eight); third-degree possession of a CDS with intent to distribute within 1,000 feet of school property (counts six and nine); and third-degree financial facilitation (count ten). Prior to trial, the court denied defendant's motion to sever counts one through three from counts four through ten.

Following a multi-day trial, the jury convicted defendant on six of the drug charges (counts four through nine); acquitted him on count ten; and was unable to return a verdict on the homicide and weapons charges resulting in a mistrial on counts one through three. After appropriate mergers, the trial court sentenced defendant to an extended ten-year term in prison with a five-year period of parole ineligibility on count six, and to a concurrent five-year term on count nine.

On appeal, defendant raises the following contentions:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION TO SEVER COUNTS [ONE], [TWO], AND [THREE] (RELATED TO THE MOSES MURDER) FROM THE WHOLLY UNRELATED CDS CHARGES (COUNTS [FOUR] THROUGH [TEN]) THEREBY DENYING DEFENDANT HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL[.] (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

[A.] THE RELEVANT LAW.

[B.] FACTS IN CARTER MANDATING A SEVERANCE.

POINT II

THE TRIAL COURT ERRED IN PERMITTING DETECTIVE CELENTANO TO TESTIFY AS A) THE STATE'S DRUG EXPERT AS THE STATE'S EXPERT REPORT DID NOT MEET THE REQUIREMENT OF AN EXPERT REPORT[;] B) THE EXPERT IMPROPERLY TESTIFIED THAT THE DRUGS DEFENDANT POSSESSED ON THE DAY OF HIS ARREST WERE CONSISTENT WITH DISTRIBUTION[;] C) IMPROPERLY CONSIDERED THE MARIJUANA THAT DEFENDANT POSSESSED[;] D) IMPROPERLY TESTIFIED THAT THE AMOUNT OF DRUGS DEFENDANT POSSESSED WOULD RESULT IN AN OVERDOSE; E) IMPROPER SPECULATION; AND F) IMPROPER REFERENCE TO HEROIN (WHICH IS NOT IN THIS CASE), IN VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND TO HIS SIXTH AMENDMENT RIGHT

3

TO CONFRONT WITNESSES AGAINST HIM. (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

A. THE IMPROPER EXPERT REPORT.

B. THE IMPROPER OPINION THAT THE DRUGS DEFENDANT POSSESSED WERE CONSISTENT WITH DISTRIBUTION.

C. THE IMPROPER REFERENCE TO MARIJUANA.

D. THE IMPROPER TESTIMONY AS TO AN "OVERDOSE."

E. THE EXPERT'S IMPROPER SPECULATION.

F. THE EXPERT'S IMPROPER REFERENCE TO HEROIN.

POINT III

THE TRIAL COURT ERRED IN DENYING THE MISTRIAL MOTION AS THE PROSECUTOR DURING HIS OPENING STATEMENT COMMITTED PROSECUTORIAL MISCONDUCT A) BY IMPROPERLY COMMENTING UPON DEFENDANT'S MARIJUANA POSSESSION (WHICH HE IS NOT CHARGED WITH IN THE INDICTMENT) AND B) BY IMPROPERLY STATING THAT A DETECTIVE SAW DEFENDANT WEARING "THE EXACT SAME OUTFIT" AS THE SHOOTER NEAR THE SCENE IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

4

A. THE IMPROPER COMMENT AS TO MARIJUANA POSSESSION.

B. THE IMPROPER COMMENT AS TO DEFENDANT WEARING "THE EXACT SAME OUTFIT" AS THE SHOOTER.

POINT IV

THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING OBJECTIONABLE AUTOPSY PHOTOGRAPHS IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT[S] AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL MANDATING A REVERSAL OF HIS CONVICTIONS. (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

POINT V

THE TRIAL COURT ABUSED ITS DISCRETION IN CHARGING FLIGHT OVER DEFENDANT'S OBJECTION IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

POINT VI

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO R. 3:18-1 AS THE STATE DID NOT PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT; DEFENDANT'S

A-2503-19

CONVICTIONS ARE CONTRARY TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE NEW JERSEY STATE CONSTITUTION. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

POINT VII

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MISTRIAL MOTION AS THE JURY HEARD INADMISSIBLE AND HIGHLY PREJUDICIAL PRIOR BAD ACT 404(B) MATERIAL IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

POINT VIII

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MISTRIAL MOTION AS THE PROSECUTOR COMMITTED MISCONDUCT BY IMPROPERLY QUESTIONING THE WITNESS BERRY AS TO DEFENDANT'S RAP VIDEOS THAT "TALK ABOUT SHOOTING PEOPLE" IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

POINT IX

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MISTRIAL MOTION AS THE PROSECUTOR COMMITTED MISCONDUCT BY IMPROPERLY QUESTIONING THE STATE'S

6

WITNESSES DETECTIVE[S] GREGUS AND AMBROMAITIS IN A MANNER THAT SUGGESTED DEFENDANT WAS IDENTIFIED AS THE SHOOTER IN A SURVEILLANCE VIDEO, IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

POINT X

THE PROSECUTOR COMMITTED MISCONDUCT A) DUE TO THE IMPROPER QUESTIONING OF THE DEFENSE WITNESS CASSANDRA MILLS AS TO DEFENDANT'S UNEMPLOYMENT[;] B) BY IMPROPERLY CHARACTERIZING MILLS' POLICE STATEMENT THAT DEFENDANT SELLS DRUGS; C) BY IMPROPERLY SUGGESTING DEFENDANT ENDANGERED MILLS' CHILDREN WITH DRUG DEALING IN THE HOUSE; AND D) BY IMPROPERLY QUESTIONING MILLS AS TO HER FAILURE TO MAKE A COMPLAINT TO THE POLICE, IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

A.   IMPROPERLY QUESTIONING AS TO UNEMPLOYMENT.

B.   IMPROPER CHARACTERIZATION OF POLICE STATEMENT.

C.   IMPROPER QUESTIONING AS TO DRUG DEALING AND CHILDREN.

D. THE IMPROPER QUESTIONING AS TO MILLS' FAILURE TO MAKE A COMPLAINT AGAINST THE POLICE.

POINT XI

THE TRIAL COURT ERRONEOUSLY RE-INSTRUCTED THE JURY WITH AN IMPERMISSIBLE REFERENCE TO THE CIVIL STANDARD OF PROOF IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

POINT XII

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL UNDER R. 3:20-1 AS THE VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

POINT XIII

THE NUMEROUS LEGAL ERRORS COMMITTED BY THE TRIAL COURT DEPRIVED DEFENDANT OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND NEW JERSEY CONSTITUTIONAL RIGHT TO A FAIR TRIAL. (U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10).

Having considered defendant's contentions in light of the record and the applicable law, we affirm.

8                                                            A-2503-19

I.

The salient facts are as follows. At approximately 8:30 p.m. on November 17, 2017, the police responded to the scene of a shooting in New Brunswick, where they found the body of Tawan Moses. A subsequent autopsy confirmed that Moses had been shot numerous times in his head and torso.

Based upon surveillance footage of the shooting which showed the shooter running away from the scene, and various witness statements including one from Tonya Denson who had witnessed an altercation between defendant and Moses two days before the shooting, police obtained an arrest warrant for defendant. Shortly before 7:00 p.m. on November 21, 2017, officers spotted defendant standing on a street near the scene of the shooting. They subsequently arrested defendant while he was in the company of a former girlfriend at a location on the same street.

While processing defendant at the police station, Officer Sean Freeman noticed an odor of raw marijuana emanating from defendant's crotch area. Freeman ran his hands up defendant's left leg and felt a plastic bag underneath his pants. Freeman ordered defendant to strip and, as defendant removed his clothing, a bag of what Freeman believed to be narcotics fell out of defendant's underpants. Later testing confirmed that the bag contained a separate bag of

9

marijuana, fifteen small plastic baggies containing crack cocaine, and twenty packets of fentanyl, a synthetic form of heroin. Officers also found $540 in cash in defendant's right pants pocket. Freeman testified that an elementary school was located within 1,000 feet of the scene of defendant's arrest.

At trial, Detective Joseph Celentano testified as an expert in illegal CDS and street-level drug trafficking. He stated that drug addicts did not typically buy their drugs in bulk as they lacked the resources to do so. Rather they purchased "smaller quantities" in cash which they used "day by day." In his experience, drug addicts were only concerned with their next immediate high, as opposed to planning for long-term usage.

Celentano related that street-level drug dealers usually had more than one kind of drug available to sell. Per Celentano, street-level dealers typically sold cocaine in tied-off plastic baggies containing a single gram each, and heroin and fentanyl in wax paper folds/glassine packets, each containing a single .2 gram dose. He explained that fentanyl was a synthetic opioid made from the same type of opium as heroin, but fifty to one hundred times more potent than heroin and much cheaper. According to Celentano, heroin/fentanyl folds were usually stamped with a dealer logo and packed in bundles of ten tied with rubber bands.

A-2503-19

Celentano testified that he examined the baggies containing cocaine and the fentanyl folds stamped "Playboy" with a red bunny which were recovered from defendant's person, and opined that the packaging was "typical for street-level distribution." He stated that if someone were to ingest twenty folds of fentanyl at one time, they would likely die.

Berry testified she had known defendant her whole life and the two shared a two-year-old child. Berry stated that, on November 21, 2017, she met up with defendant at the arrest scene, which was outside the home of a friend, because she needed to ask him for rent money. She confirmed that defendant was involved with rap music and made music videos.

Defendant did not testify at trial, but did present a single witness, his current girlfriend Cassandra Mills with whom he had a daughter. Mills testified that in 2017 defendant was staying with her at her home in New Brunswick. Mills acknowledged that defendant did not work a steady job. Rather, he was an entrepreneur who sold Jello shots, t-shirts, and ski masks, and was also involved in rap and hip-hop music and made music videos. Miller noted that defendant had a drug problem, specifically with crack cocaine and heroin.

Mills reported that, on November 17, 2017, she returned home at 9:00 a.m. after finishing her morning job as a school bus driver and she and defendant

went to breakfast. According to Mills, defendant was "his regular jolly self." Defendant left after breakfast and did not return until "[a]bout 3:00 a.m." They also had breakfast as usual on November 18.

Mills testified that defendant slept at her home each of the next three nights. She denied that he was hiding out or that he asked her to dispose of anything for him. On cross-examination, she confirmed that, upon searching her home after defendant's arrest, police found a box containing a digital scale, a plate, baggies and three razor blades. Mills denied that these items belonged to her.

## II.

In Point I of his brief, defendant contends that the trial court erred in denying his motion for severance. We disagree.

Generally, in deciding a motion for severance of charges, the trial court enjoys "a wide range of discretion[.]" State v. Coruzzi, 189 N.J. Super. 273, 297 (App. Div. 1983). A denial of a motion for severance should not be reversed "absent a mistaken exercise of that discretion." Ibid.

"[W]here the evidence establishes that multiple offenses are linked as part of the same transaction or series of transactions, a court should grant a motion for severance only when [a] defendant has satisfied the court that prejudice

12

would result." State v. Moore, 113 N.J. 239, 273 (1988). The courts have recognized that any trial involving several charges "probably will involve some potential of [prejudice], since the multiplicity alone may suggest to the jury a propensity to criminal conduct." Coruzzi, 189 N.J. Super. at 297. However, "other considerations, such as economy and judicial expediency, must be weighed" when deciding a severance motion. Ibid. These interests may require that charges remain joined, "so long as the defendant's right to a fair trial remains unprejudiced." Id. at 298.

The proper inquiry when deciding a motion for severance is whether, if the crimes were tried separately, evidence of the severed offenses would be admissible at the trial of the remaining charges. State v. Chenique-Puey, 145 N.J. 334, 341 (1996). If the evidence would be admissible at both trials, the trial court should not sever the charges, because the defendant "will not suffer any more prejudice in a joint trial than he would in separate trials." Coruzzi, 189 N.J. Super. at 299. To evaluate whether evidence of each crime would be admissible at the trial of the others, and thus whether severance should be denied, the trial court must utilize the same standard used to determine whether other-crime evidence is admissible under N.J.R.E. 404(b). Chenique-Puey, 145 N.J. at 341.

Our Supreme Court's opinion in State v. Cofield, 127 N.J. 328 (1992), sets forth the well-established test for deciding whether evidence is admissible under this rule:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Id. at 338 (citation omitted).]

The party seeking to admit other-crime evidence bears the burden to establish each of the four prongs. See State v. J.M., 225 N.J. 146, 158-59 (2016). A court's determination on the admissibility of other-crime evidence is "entitled to deference" and is "reviewed under an abuse of discretion standard." State v. Ramseur, 106 N.J. 123, 266 (1987). "Only where there is a 'clear error of judgment' should the 'trial court's conclusion with respect to [the] balancing test' be disturbed." State v. Marrero, 148 N.J. 469, 483 (1997) (quoting State v. DiFrisco, 137 N.J. 434, 496-97 (1994)).

14

Prior to trial, defendant filed a motion to sever the counts pertaining to the drugs offenses (counts four through ten) from the counts related to the murder (counts one through three). At a hearing on the motion, defense counsel argued that the murder charges and the drug charges had nothing to do with each other.

The trial court denied the motion. In its oral decision, the court first reviewed the facts in the case, highlighting that: (1) per Denson, on November 15, 2017, the victim allegedly approached defendant, pointed a gun at him and told him that he could no longer sell drugs in New Brunswick; (2) Denson saw defendant subsequently walk away and heard him mutter "you just messed up"; (3) the victim was shot two days later; and (4) at the time of his arrest defendant was found in possession of fifteen bags of crack cocaine, twenty folds of heroin, marijuana, and $540 in cash. The court noted that, according to the State's theory of the case, defendant murdered the victim because of a dispute over drug territory and the drugs found in his possession at the time of his arrest were proof of his motive.

The trial court then applied the four-prong Cofield analysis to determine whether proof of the drug offenses would be admissible in a separate trial of the murder charges. The court deemed prong one satisfied because:

> In this case, the other act evidence is defendant
> being found in possession of drugs four days after the

victim's murder.  Given that . . . the evidence recovered in this case suggests the defendant was selling drugs and given the State's assertion that defendant murdered the victim, because the victim threatened defendant and told defendant that he can no longer sell drugs in New Brunswick, the drug charges are . . . related to the . . . homicide charges.

The drug . . . charges here . . . bear on . . . a material issue in dispute, because it provides motive for the murder.

Next, the court found that:  (1) prong two was not applicable; and (2) prong three was satisfied because the State intended to present testimony from the officers who discovered the drugs on defendant's person after his arrest.  As to prong four, the court found that the probative value of the drug offense evidence was not significantly outweighed by its inflammatory potential because the evidence clearly supported motive and was integral to the State's proof.  Thus, as all relevant prongs of the Cofield analysis were satisfied, the court ruled that severance was not warranted.

We discern no basis for disturbing the trial court's well-reasoned determination.  As the court noted, the State's theory of the case, which was predicated upon Denson's statement regarding the interaction between defendant and the victim two days before the shooting, was that the shooting was the result of a turf dispute between two drug dealers.  The discovery of significant amounts

16

of drugs and cash on defendant's person at the time of his arrest supported the State's contention that he was a drug dealer with a motive to eliminate the challenging interloper, Moses. Under these circumstances, the court did not abuse its discretion by denying defendant's severance motion.

III.

Defendant contends in Point II that the trial court erred by permitting Celentano to testify because the prosecutor provided a deficient and erroneous summary of his intended testimony during discovery. Defendant also contends that he was denied a fair trial when Celentano improperly: (1) testified that the packaging of the cocaine defendant possessed was consistent with distribution; (2) referenced the marijuana possessed by defendant; (3) testified that the amount of cocaine defendant possessed would result in an overdose; (4) speculated as to whether drug addicts typically had the resources to buy drugs in large quantities; and (5) referenced heroin. Again, we disagree.

We defer to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). We will not substitute our judgment unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment." Id. at 430 (quoting State v. Medina, 242 N.J. 397, 412

(2020)). Reversal of a conviction is only warranted when a mistaken evidentiary ruling has the "clear capacity to cause an unjust result." Ibid.

Pursuant to N.J.R.E. 703, an expert opinion must be grounded in facts or data derived from: "(1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." An expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Davis v. Brickman Landscaping, 210 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 372 (2010). An expert is not permitted to express "speculative opinions" or "personal views" that are either unfounded in the record or that contradict the record. Townsend v. Pierre, 221 N.J. 36, 55 (2015).

Experts in drug distribution cases are permitted to offer necessary insight into matters that are not commonly understood by the average juror, such as the significance of drug packaging and weight, the function of drug paraphernalia such as scales, baggies and cutting agents, the meaning of drug logos, the value of the drugs and how low-level drug transactions are arranged and carried out. State v. Cain, 224 N.J. 410, 413-14 (2016).

However, once apprised of the peculiar characteristics of a drug-distribution scheme, it is left to the jury to decide whether a defendant possessed the requisite mental state to commit a particular drug offense. Id. at 414, 426-27. The expert may not intrude on the jury's exclusive domain as factfinder by offering "ultimate-issue testimony" either directly or by way of answers to loaded hypothetical questions that "may be viewed as an expert's quasi-pronouncement of guilt." Id. at 427. It is for the jury to sort through the evidence and use its "common sense to make simple logical deductions." Ibid.

Defendant begins his contentions on this point by asserting that the prosecutor did not provide an adequate summary of Celentano's proposed expert testimony under Rule 3:13-3(b)(I). This rule allows the prosecutor to provide to the defense a "statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion" in lieu of an expert-authored formal report. The prosecutor's letter stated:

> The State anticipates calling Det. Celentano to testify as an expert in the above-referenced trial. The expert testimony will explain to the jury how cocaine, heroin and marijuana are processed and packaged, the value of these drugs, and how these drugs are generally distributed. He will also discuss the different methods of ingesting heroin, cocaine and marijuana, the paraphernalia most commonly possessed by drug users for ingestion of these particular drugs, and the quantities of heroin, cocaine and marijuana normally

19

> purchased and ingested by users. This testimony will
> be based upon his training and experience as reflected
> in his curriculum vitae enclosed herein.

Ten months after defense counsel received this summary, he objected to it by claiming it was too "generic." The trial court ruled that the objection was untimely as counsel had had ten months to seek any needed clarification, and the summary, while sparse, satisfied <u>Rule</u> 3:13-3.

During Celentano's testimony, defense counsel renewed his objection, noting that the summary referenced heroin, not fentanyl. The prosecutor responded that an updated discovery letter may have been sent to defense counsel after defendant's arraignment on the superseding indictment,[1] but that, in any event, fentanyl was a synthetic form of heroin and was packaged the same way as heroin for street-level distribution. The trial court overruled defense counsel's objection.

We detect no abuse of discretion in the court's ruling. As the court observed, defense counsel had ample time to reach out to the prosecutor had he really been in doubt as to the substance of Celentano's intended testimony, the

---

[1] The original indictment incorrectly listed heroin as the CDS involved in counts four and five. The superseding indictment corrected this mistake by listing fentanyl as the drug involved in the offenses.

parameters of which were prescribed under <u>Cain</u>.  Moreover, the summary was sufficiently detailed to meet the requirements of <u>Rule</u> 3:13-3.

Next, defendant contends that the trial court improperly permitted Celentano to opine that defendant possessed the twenty baggies of cocaine for distribution.  This argument also lacks merit.

During Celentano's testimony, the following colloquy occurred:

> [Prosecutor]:  Twenty bags of crack cocaine, is that typical of a personal use quantity?
>
> [Celentano]:  Twenty bags of cocaine?
>
> [Prosecutor]:  Yes.
>
> [Celentano]:  The way it's packaged right here?
>
> [Prosecutor]:  Yes.
>
> [Celentano]:  No, that's for distribution.

At this point, defense counsel objected and requested a mistrial.  The prosecutor agreed that Celentano's last statement should be struck, but argued that a mistrial was not warranted.  The trial court sustained the objection and ruled that it was going to strike both the question and the answer and give a curative instruction.  Thereafter, the court instructed the jury as follows:

> All right.  Ladies and gentlemen, I am . . . striking the last question and answer and directing you to disregard the question and the response.  And what that

A-2503-19

essentially means is that when you deliberate in this case, you are not to consider for any reason the question that . . . was posed and the response given by the detective.

And the reason why I am striking that question and answer is because whether the drugs in this case were possessed for personal use or for distribution is not to be made by the detective sitting here but by you.

All the detective can testify as an expert is to how drugs are packaged, how drugs are used on the street, how drugs are ingested, and things of that – things of that sort.

Whether these drugs were possessed for personal use or not or possessed for distribution is beyond the ken of his testimony, is beyond his expertise. It's for you to decide as a jury whether these drugs here were for personal use or for the purposes of giving it or selling it or distributing it to someone else.

Because the court struck the testimony and issued a thorough curative instruction, which we presume the jury followed, State v. Smith, 212 N.J. 365, 409 (2012), there was no need for a mistrial.

Next, defendant contends that he was denied a fair trial when Celentano was permitted to comment upon the marijuana found in defendant's possession despite the fact that defendant was not charged with marijuana possession. However, it must be noted that, in the colloquy defendant highlights as

22

prejudicial to him, Celentano spoke only in generalities based upon his experience and defense counsel made no objection to his testimony:

> [Prosecutor]: Is it typical for people to have an appetite for one drug at a time?
>
> [Celentano]: Yes. Drug users, yes.
>
> [Prosecutor]: Is it – would it be uncommon or atypical for a person to have larger quantities of two different drugs simultaneously?
>
> [Celentano]: I've seen . . . users have marijuana and cocaine or marijuana and heroin. Marijuana seems like a wide drug that's commonly abused. But to have cocaine, heroin, and marijuana or Fentanyl, meth, and marijuana, that's not typical on the street for a user or a dealer to have.
>
> [Prosecutor]: Do dealers deal to a wide variety of customers?
>
> [Celentano]: Yes.
>
> [Prosecutor]: Do dealers have heroin customers while at the same time having . . . cocaine customers or having marijuana customers?
>
> [Celentano]: Yes.
>
> [Prosecutor]: So is it typical for a dealer to have more than one drug available for purchase?
>
> [Celentano]: Absolutely.

A-2503-19

Given that this testimony fell within Celentano's purview as an expert in street-level drug trafficking, we reject defendant's contention that it was improper or prejudicial in any way.

Next, defendant contends that he was denied a fair trial when Celentano testified that ingesting twenty bags of crack cocaine at once would likely result in an overdose. However, Celentano did not actually testify to this as defense counsel objected before he could answer and the prosecutor did not subsequently repeat his question. Rather, the prosecutor asked whether twenty bags of crack cocaine was typical of personal use quantity.

Celentano did testify, without defense objection, that if someone were to ingest twenty folds of fentanyl they would probably die. While defendant is correct that this case did not involve an overdose, we cannot overlook that defendant's defense to the drug distribution charges was that he was an addict guilty only of drug possession, not a dealer. Defense counsel made this argument to the jury in both his opening and closing statements. As such, the prosecutor's exploration of whether the amount of drugs found on defendant's person was consistent with reasonable personal usage was a proper response to defense counsel's argument.

A-2503-19

Next, defendant contends that Celentano improperly speculated that drug addicts did not typically have the resources to buy large quantities of drugs at one time. However, as the trial court found in overruling defense counsel's objection, this testimony was offered within the frame of Celentano's experience in street-level drug trafficking and thus, was not improper speculation.

Lastly, defendant contends he was denied a fair trial when Celentano was permitted to testify regarding the packaging, pricing and usage of heroin when this case did not involve heroin. However, Celentano explained that fentanyl was a synthetic form of heroin and was packaged in the same manner for street-level sale. The jury was well aware that no heroin was found on defendant's person. Thus, we also reject this portion of defendant's argument.

IV.

In Point III, defendant argues that the trial court should have denied his motion for a mistrial following the prosecutor's opening statement because the prosecutor improperly commented upon defendant's possession of marijuana, and that an officer observed defendant wearing "the exact same outfit" as the shooter. We disagree.

A motion for a mistrial should be granted only in those situations which would otherwise result in manifest injustice. State v. DiRienzo, 53 N.J. 360,

383 (1969).  The decision to deny a motion for a mistrial is within the sound discretion of the trial judge, and will only be reversed on appeal for abuse of this discretion.  State v. Winter, 96 N.J. 640, 647 (1984).

A conviction may be reversed based on prosecutorial misconduct only where the misconduct is so egregious in the context of the trial as a whole as to deprive the defendant of a fair trial.  State v. Wakefield, 190 N.J. 397, 435-38 (2007).  Although a single instance of prosecutorial misconduct may not be so prejudicial as to warrant reversal, the cumulative effect of several such instances may create such prejudice.  State v. Rodriguez, 365 N.J. Super. 38, 49 (App. Div. 2003).  When the alleged misconduct involves a particular remark, a court should consider whether:  (1) defense counsel objected in a timely and proper fashion to the remark; (2) the remark was withdrawn promptly; and (3) the court gave the jury a curative instruction.  State v. Smith, 212 N.J. 365, 403-04 (2012); State v. Zola, 112 N.J. 384, 426, (1988).

The scope of the State's opening statement is limited to the "facts he intends in good faith to prove by competent evidence."  State v. Hipplewith, 33 N.J. 300, 309 (1960).  "'A prosecutor's opening statement should provide an outline or roadmap . . . limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'"  State v. Walden, 370 N.J. Super.

549, 558 (App. Div. 2004) (quoting State v. Torres, 328 N.J. Super. 77, 95 (App. Div. 2000)).  Reversal on the basis of a prosecutor's opening remarks is not warranted unless the challenged remark is completely unsupported by the evidence and there is a showing of prejudice to the defendant and bad faith by the prosecutor.  Hipplewith, 33 N.J. at 309.

a. Marijuana possession

During his opening statement, the prosecutor stated as follows:

> Mr. Carter is arrested and he is found in possession of drugs.  And ladies and gentlemen, I said to you from the outset this case was about drugs and about selling drugs and the control of selling drugs.  Mr. Carter had 20 folds of fentanyl.
>
> Now, you will hear from a witness in this case that fentanyl is a drug that is sold in lieu of heroin.  It is a synthetic version of heroin and it is packaged the same way.  [It] [i]s often sold for the same price and it was packaged for sale, 20 folds of it.
>
> Also, there are 15 bags, small individualized bags for personal use of cocaine, one[]s that could be easily sold on the street.  Mr. Carter also has a small bag of marijuana and has over $500 in cash.
>
> [(emphasis added).]

Although defense counsel did not immediately object to the comment about defendant's possession of marijuana, he moved for a mistrial at the conclusion of the prosecutor's remarks arguing as follows:

[Defense counsel]: Judge, I want to make an application for a mistrial based upon the comments that were made by [the prosecutor] dealing with my client possessing marijuana. He is not charged with marijuana in this particular instance before this jury. He has not been indicted for it and they shouldn't hear about it. It's improper and I object to it.

[Prosecutor]: First of all, Judge, it was [disorderly persons] weight of marijuana, so he couldn't be indicted. Second, it's evidential because that's how the officers did a search of Mr. Carter. It resulted in a strip search of him and-

THE COURT: I'm sorry?

[Prosecutor]: It resulted in a strip search where they had to remove all of his clothing. I don't want any inference drawn that the police treated him cruelly and they did this arbitrarily. The smell of marijuana is what prompted them to say we need to do a search. They felt something in his underwear. They smelled marijuana.

THE COURT: All right.

[Prosecutor]: Judge–

THE COURT: How is your client prejudiced?

[Defense counsel]: Judge, that is so disingenuous, number one because they had an arrest warrant for Mr. Carter.

THE COURT: All right, fine. How is he–

[Defense counsel]: Because they are just layering it on, layer after layer. The jury has nothing to do or nothing to hear with marijuana.

28

. . . .

[Defense counsel]:  Judge, I made my record.

THE COURT:  You've made your objection.  The objection is overruled.

We agree with the trial court that the comment did not prejudice defendant.  As the prosecutor noted, the odor of marijuana is what alerted the processing officers to the possibility that defendant had drugs on his person and prompted the strip search which confirmed that this was the case.

b.  Defendant's clothing

In his opening statement, the prosecutor also told the jury that an eyewitness to the shooting gave police a "very accurate" description of the shooter, i.e., an "African-American male, camouflage jacket, gray hooded sweatshirt, dark skin complexion."  He related that police obtained surveillance video showing the shooting and were able to isolate a photo of the shooter.  The prosecutor then stated that, upon being shown the photo, Officer Karlo Sarmiento "immediately said that at 7:00 on the night of the murder, he saw [defendant] wearing the exact same outfit about a block and a half away . . . outside a liquor store."

Defense counsel immediately objected, arguing that according to the police reports, Sarmiento actually stated that defendant was wearing a "similar" outfit when he saw him earlier. The prosecutor insisted that Sarmiento said that defendant was "wearing the exact same clothes as the photograph he was shown." The trial court ruled that it was going to remind the jury that what a lawyer said in an opening statement was not evidence but what he expected the evidence to show. Although the prosecutor disputed the necessity of this instruction given that he did not believe he had misspoken, defense counsel did not have "any problem with [this] instruction." The court, thereafter, reinstructed the jury with this precept at the conclusion of the prosecutor's opening statement.

Although defendant again renews the objection on appeal, the trial court committed no error. Our review of the record indicates that when shown the photo of the shooter, Sarmiento stated he saw defendant wearing the same outfit earlier. As such, and because the trial court repeated the cautionary instruction sought by defense counsel over the prosecutor's objection, we reject this portion of defendant's argument.

V.

In Point IV, defendant argues that the trial court abused its discretion by admitting certain autopsy photos into evidence. This argument lacks sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2). Based upon our review of the record, including defendant's confidential appendix containing the photos, we agree that this material was relevant to establish defendant's criminal state of mind and, as the court found, the photos were not particularly gruesome.

## VI.

Defendant argues in Point V of his brief that the trial court abused its discretion by instructing the jury on the permissible inference of consciousness of guilt flowing from flight in connection with the murder count. However, defendant was not convicted on this count or the related weapons offenses. Because the flight charge had no capacity to prejudice defendant concerning the drug charges, we reject defendant's contention on this point.

## VII.

In Point VI, defendant argues that the trial court erred by denying his motions for a judgment of acquittal at the end of the State's case and again following the jury's verdict. This argument also lacks merit.

The test to be applied on such a motion is

31

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
> [State v. Reyes, 50 N.J. 454, 458-59 (1967).]

Here, the State provided ample evidence to support the court's denial of defendant's motions. Specifically, lab tests confirmed that the drugs found in defendant's possession were fentanyl and cocaine; Celentano's testimony provided a basis for the jury to infer that defendant intended to distribute these drugs; and there was testimony based on a certified school zone map that defendant was within 1,000 feet of a school when he was arrested. Under these circumstances, the court correctly denied defendant's motions.

## VIII.

Defendant argues in Point VII that the trial court erred by denying his mistrial motion after a redacted portion of Densen's recorded statement was inadvertently played for the jury. However, this contention is not persuasive.

During her statement to the police, Denson speculated that Moses may have put pressure on defendant to stop selling drugs in the area because defendant was "the big man . . . on the block right now." Defendant asked the

court to order the State to redact this portion of the statement before playing it for the jury, and the court agreed.

At trial, the prosecutor gave the jury redacted transcripts of Denson's statement, but mistakenly played the unredacted recording. However, all the juror heard was the detective's question, "Okay, and what would be a reason to go to [defendant]" because the prosecutor stopped the tape before the detective completed the question and before Denson replied that defendant was the "big man on the block."

Nevertheless, defendant moved for a mistrial. The trial court denied the motion because the jury had not heard the inadmissible portion of the tape. The court solicited defense counsel's input in crafting a cautionary instruction, and the court then instructed the jury as follows:

> Now, when you were here we were at Page 6 on the transcript, and as it was being played . . . there was a question posed by the detective, and at that point [the prosecutor] stopped the recording. There's a reason for that, because this Court has made a determination as to what is evidence in this case and what is not evidence in this case. And as you can see on your transcript the bottom half has been cut out. And the reason it's cut out is because . . . that's not the evidence that you are to – that is not evidence in this case.
>
> You are hearing a selection made by the Court of the recording of the statement that was given by Tonya Denson to the police. What you are hearing is what the

prosecutor, defense counsel and the Court have agreed is the appropriate evidence for your consideration in this case.

So keep in mind that what is evidential is – is what you hear on this tape. You're not to speculate about what you don't hear. You are not to speculate or wonder in any way about what you are not hearing on the audiotape. All right? Let's proceed.

Thus, the jury never heard the remark that had been redacted. Because the trial court also provided the jury with a strong curative instruction, defendant was in no way prejudiced by the prosecutor's error. Therefore, we reject his contention on this point.

## IX.

Turning to Point VIII of defendant's brief, we also reject his argument that the prosecutor improperly questioned Berry about defendant's rap videos. When the prosecutor asked Berry if the videos "talk about shooting people," she answered "no" and defense counsel objected and moved for a mistrial. The trial court denied this request, but gave the jury the following instruction:

All right, so ladies and gentlemen, the prosecutor asked this witness questions related to what she knows about defendant's life. And to that extent, he inquired about [defendant's] participation in the creation of rap music.

We all know and all have an understanding what rap music is all about is – is – is lyrics that – that – that

> talk about the urban experience, the urban drug culture where they're shooting and where there's drugs.
>
> Just because someone engages in and writes music and – and participates in the production of music related to rap music is not evidence that a person has committed an offense such as is charged in this indictment.
>
> So to that extent, you are not to consider just because Mr. Carter may have participated in the production of rap music that he is in any – that that constitutes some sort of evidence that he committed any of these offenses.

We presume that the jury followed this instruction. Smith, 212 N.J. at 409.

Contrary to defendant's contention, this case is plainly distinguishable from State v. Skinner, 218 N.J. 496 (2014). In that case, our Supreme Court reversed the defendant's convictions of a number of charges, including attempted murder and aggravated assault, finding that he had been unduly prejudiced by the admission at trial of graphically violent rap lyrics he had written which "could be fairly viewed as demonstrative of a propensity toward committing, or at the very least glorifying, violence and death." Id. at 499-500, 521. In so doing, the Court "reject[ed] the proposition that probative evidence about a charged offense can be found in an individual's artistic endeavors absent a strong nexus between specific details of the artistic composition and the

circumstances of the offense for which the evidence is being adduced." Id. at 522.

Here, not only were no violent lyrics (written by defendant or someone else) introduced into evidence, but Berry denied that defendant's videos talked about shooting people, and the court administered a curative instruction in accordance with Skinner.  Therefore, we reject defendant's contention that he was unduly prejudiced and denied a fair trial as a result of the prosecutor's questioning of Berry.

## X.

In Point IX, defendant argues that the trial court erred by denying his motion for a mistrial after the prosecutor questioned Detectives Brandt Gregus and David Abromaitis in a manner that defendant believes suggested he was identified as the shooter in a surveillance video.  This argument lacks sufficient merit to warrant extended discussion in a written opinion.  R. 2:11-3(e)(2).

Our review of the record demonstrates that Gregus referred to defendant by name rather than as the "suspect" when testifying about a photo of three people taken from a surveillance video.  However, the trial court struck the testimony and gave the jurors an immediate curative instruction directing them to disregard the remark.  Thus, there was no basis for a mistrial.

Similarly, the trial court later correctly denied defendant's motion for a mistrial after Abromaitis stated that the "suspect" was depicted in photographs he reviewed on the witness stand. Moreover, this remark was fleeting and because defendant was not convicted of the murder and weapons charges that were the subject of this testimony, he failed to demonstrate he was prejudiced in any way by the remark.

## XI.

In Point X of his brief, defendant asserts he was denied a fair trial when the prosecutor (1) questioned Mills regarding defendant's unemployment; (2) mischaracterized Mills's police statement; (3) suggested that defendant endangered Mills's children through his drug activities; and (4) questioned Mills as to her failure to make a complaint over her treatment by police. However, he has not provided any legal argument supporting this contention other than his point heading. See State v. Hyuang, 461 N.J. Super. 119, 125 (App. Div. 2018) (an issue not briefed is deemed waived); see also State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977) (stating that the "absence of any reference to the law" in a brief "suggests a like paucity of authority helpful to the party.").

In any event, we have reviewed each of the examples defendant cites and find no impropriety on the prosecutor's part in his questioning of Mills. Contrary

to defendant's contention, defense counsel opened the door to inquiries about defendant's employment when he elicited testimony from Mills regarding defendant's activities as an entrepreneur. Moreover, the prosecutor appropriately cross-examined Mills on defendant's drug use after she stated that he "hustled" on the street.

The trial court sustained defense counsel's objection to the prosecutor's question asking Mills whether her children were present in the home during the period in which the drug paraphernalia the police found in her home was there. Mills never provided an answer to this question. Finally, we are satisfied the trial court correctly overruled defense counsel's objection to the prosecutor's question concerning why Mills did not complain to police about her treatment by them during her interview with them.

## XII.

In Point XI, argues that the trial court erred by referring the jurors to the civil standard of proof while reinstructing them during deliberations. This contention is meritless.

The court gave this instruction to the jury in response to its request for examples of "reasonable doubt" or a shorthand explanation of this term. After consulting with counsel, the court first told the jurors where the definition of

reasonable doubt could be found in the written instructions it had previously provided to them. The court then instructed the jury as follows:

> The State must prove . . . every element of an offense beyond a reasonable doubt. So what's a reasonable doubt? Let's start with this.
>
> As – as I told you, in a civil case the plaintiff has to prove the case by a standard of proof that we call a preponderance of the evidence. That means the greater weight of the evidence. In that case, imagine a scale of justice. In order for a plaintiff to achieve a preponderance, he would have to tip the scale ever so slightly to his side.
>
> In a criminal case, the burden of proof is higher. We call that burden of proof beyond a reasonable doubt. Beyond a reasonable doubt is satisfied when you are firmly convinced of the defendant's guilt. That is you don't harbor in your mind an honest and reasonable uncertainty about the guilt of the defendant after you have given full and impartial consideration to all of the evidence.
>
> Now, of course, a doubt is one that leaves the reasonable person, after hearing the evidence, in doubt. Whether that doubt arises from the evidence itself or from a lack of evidence. The law – the law only requires that you be firmly convinced, because we cannot know most things with absolute certainty. So in criminal cases, the law does not require proof that overcomes every possible doubt.
>
> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged you must find him guilty. If, on the other hand, you're not firmly convinced of the

> defendant's guilt, you must give the defendant the benefit of the doubt and find him not guilty.

Contrary to defendant's contentions, we discern no impropriety in the court's instruction. Defendant does not explain how the court's explanation of the reasonable doubt issue prejudiced him in the context of the entire charge. See State v. Torres, 183 N.J. 554, 564 (2005) (A jury charge "must be read as a whole in determining whether there was any error."). The court clearly explained that the civil standard of proof did not apply and that the criminal standard was far more rigorous. In this context, the mere mention of the civil standard, in order to emphasize the State's greater burden of proof in this criminal case, does not mandate reversal.

## XIII.

Prior to sentencing, defense counsel moved for a new trial, arguing that the trial court had erred in: (1) denying the severance motion; (2) permitting the prosecutor to reference defendant's possession of marijuana in his opening statement; (3) admitting the identification of defendant by Gregus; (4) admitting the identification of defendant by Abromaitis; (5) permitting Celentano to testify; (6) admitting autopsy photos; (7) allowing the prosecutor to question Berry regarding defendant's rap videos; (8) permitting the prosecutor to question Mills as to why she had not complained of the abusive treatment of her by police;

and (9) charging the jury on reasonable doubt. The trial court denied the motion finding that: (1) counsel's arguments were, in large measure, completely unrelated to the counts dealing with the drug charges; (2) each issue had been addressed by the court with ample reasons set forth on the record; and (3) nothing in counsel's arguments indicated that the issues had been wrongly decided.

In Point XII of his brief, defendant merely recites the same assertions he made to the trial court without providing any additional legal argument, noting that each has been raised in a separate point in his appellate brief. We have already rejected all of defendant's contentions. Therefore, we are also satisfied that the court's denial of the defendant's motion for a new trial was not "a miscarriage of justice under the law." See R. 2:10-1; State v. Labrutto, 114 N.J. 187, 207 (1989).

## XIV.

Finally, defendant asserts in Point XIII of his brief that the cumulative prejudice of the errors he raises deprived him of a fair trial. Having rejected defendant's argument that any reversible error occurred during his trial, we also reject his cumulative error argument.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2503-19